UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| JARETT SCHWARTZ, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | No. 1:25-cv-12222-JEK |
| HELLOFRESH SE and FACTOR75, LLC, | ) ) ) | |
| Defendants. | ) ) | |

## MEMORANDUM AND ORDER ON DEFENDANTS' MOTION
## TO COMPEL ARBITRATION OR ALTERNATIVELY TO DISMISS

**KOBICK, J.**

Plaintiff Jarett Schwartz alleges that defendants Factor75, LLC and HelloFresh SE have violated state and federal law by sending him over fifty unsolicited telemarketing text messages. Pending before the Court is the defendants' motion to compel arbitration and stay proceedings or alternatively to dismiss the complaint for failure to state a claim. For the reasons that follow, the Court will grant the motion to compel arbitration and stay this case pending arbitration between Schwartz and Factor75. A valid arbitration agreement exists between Schwartz and Factor75, but HelloFresh, as a nonsignatory, cannot invoke that agreement under an equitable estoppel theory.

### BACKGROUND

The following facts are drawn from the complaint and documents submitted in connection with the motion to compel arbitration. *Rodríguez-Rivera v. Allscripts Healthcare Sols., Inc.*, 43 F.4th 150, 168 (1st Cir. 2022).

Schwartz is a Massachusetts resident whose name and residential cellphone number have been listed on the national and Massachusetts do-not-call registries since at least May 2024. ECF

1-1, ¶¶ 6, 18, 28-29. Factor75 delivers prepared meals that are ready to eat. *Id.* ¶ 13. It is a subsidiary of HelloFresh, which operates similar meal kit delivery services. *Id.* ¶¶ 15-16.

On May 24, 2024, Schwartz purchased a meal plan subscription from Factor75 and placed his first order. *Id.* ¶ 18; ECF 17-1, ¶¶ 2-3. To subscribe, he "submitted his name, address, and phone number on the website www.factor75.com." ECF 17-1, ¶ 3. Schwartz also clicked a toggle switch embedded within a white box, set off from the rest of the webpage, titled "Promotions, offers & marketing." *Id.* (bold omitted). That toggle switch had, as depicted below, been switched off when first presented to him:



*Id.* When he clicked the toggle switch from off to on, Schwartz indicated his agreement to "[r]eceive offers and promotions via text messages" from Factor75. *Id.* The text immediately

underneath the toggle switch stated: "By checking the box above, I agree to Factor's Terms and Conditions & Privacy Policy and agree to receive recurring texts via automated technology, including for promotions, subscriptions, etc., by or on behalf of Factor, including after any subscription deactivation." *Id.* It also said that "I understand . . . that I may opt out any time by texting STOP." *Id.* As is typical for hyperlinks, the words "Terms and Conditions" and "Privacy Policy" were underlined and appeared in blue text. *Id.*

The first page of those hyperlinked Terms and Conditions emphasized: "PLEASE REVIEW THE TERMS CAREFULLY, PARTICULARLY . . . SECTION 24 RELATED TO BINDING ARBITRATION." ECF 17-2, at 1 (bold omitted); *see* ECF 17-1, ¶ 4. The next page similarly noted: "PLEASE BE AWARE THAT SECTION 24 OF THIS AGREEMENT . . . CONTAINS AN ARBITRATION AGREEMENT WHICH WILL, WITH LIMITED EXCEPTIONS, REQUIRE DISPUTES BETWEEN US TO BE SUBMITTED TO BINDING AND FINAL ARBITRATION." ECF 17-2, at 2 (bold omitted). Section 24 likewise provided at the outset: "PLEASE READ THE FOLLOWING ARBITRATION AGREEMENT IN THIS SECTION . . . CAREFULLY BECAUSE IT REQUIRES YOU TO ARBITRATE CERTAIN DISPUTES AND CLAIMS WITH FACTOR." *Id.* § 24.

Section 24.1, in turn, stated: "You agree that any dispute, claim, or request for relief relating in any way to your access or use of the Site or the App, to any products sold or distributed through the Site or the App, or to any aspect of your relationship with Factor, will be resolved by binding arbitration, rather than in court, except" in certain circumstances not applicable here. *Id.* § 24.1.[1] Section 24.3 contained a delegation clause that gives the arbitrator "exclusive authority to

---

[1] The exceptions for seeking "relief in small claims court" or "equitable relief in court for infringement or other misuse of intellectual property rights" do not apply here. ECF 17-2, § 24.1.

3

(a) determine the scope and enforceability of this Arbitration Agreement and (b) resolve any dispute related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement including, but not limited to, any assertion that all or any part of this Arbitration Agreement is void or voidable." *Id.* § 24.3. And in Section 24.8, a survival clause provided that "[t]his Arbitration Agreement will survive the termination of your relationship with Factor." *Id.* § 24.8.

After placing approximately fifteen orders with Factor75, Schwartz cancelled his subscription on November 6, 2024. ECF 1-1, ¶¶ 18-19. He has since received 57 unsolicited text messages from the defendants. ECF 26-1; *see* ECF 1-1, ¶ 20; *id.*, Ex. 1. While not identical, the messages all offered a discounted meal plan with Factor75 and stated that Schwartz could "Reply STOP to end texts." ECF 1-1, ¶¶ 23-24. These marketing messages continued even after Schwartz replied "STOP" three times in January 2025 and sent the defendants demand letters in May 2025. *Id.* ¶¶ 20-22; *see* ECF 26-1. In Schwartz's view, he did not consent to receive the defendants' text messages and, in any event, opted out of any further communications when he cancelled his subscription and texted "STOP." ECF 1-1, ¶¶ 25-27.

Schwartz brought this lawsuit in July 2025 in Norfolk Superior Court. ECF 15, at 1-23. The complaint asserts that the defendants have violated the Massachusetts Telephone Solicitation Act ("MTSA"), M.G.L. c. 159C (Count I); the Telephone Consumer Protection Act ("TCPA"), 47 U.S.C. § 227 *et seq.* (Count II); and the Massachusetts Consumer Protection Act, M.G.L. c. 93A (Count III). ECF 1-1, ¶¶ 44-64. Schwartz claims that, among other violations, Factor75 and HelloFresh continued to send unsolicited text messages even though his phone number is on the national and state do-not-call registries and he had opted out of future messages by texting "STOP." *Id.* ¶¶ 34-35. The following month, the defendants removed the case to this Court and

moved to compel arbitration or alternatively to dismiss the complaint for failure to state a claim. ECF 1, 16. After Schwartz opposed that motion and the defendants filed a reply, the Court held a hearing and took the motion under advisement. ECF 26, 46, 51.

## DISCUSSION

The Federal Arbitration Act ("FAA") reflects both "the fundamental principle that arbitration is a matter of contract" and "a liberal federal policy favoring arbitration." *AT&T Mobility LLC v. Concepcion*, 563 U.S. 333, 339 (2011) (quotation marks omitted). Its main substantive clause states that a "written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Because "arbitration agreements are simply contracts," the "'first principle that underscores all' Supreme Court precedent interpreting the FAA '"is that [a]rbitration is strictly a matter of consent."' *Coinbase, Inc. v. Suski*, 602 U.S. 143, 148 (2024) (quoting *Lamps Plus, Inc. v. Varela*, 587 U.S. 176, 184 (2019)). "As a consequence of the FAA's contract-based philosophy, its liberal policy favoring arbitration is only triggered when the parties actually agreed to arbitrate." *Air-Con, Inc. v. Daikin Applied Latin Am., LLC*, 21 F.4th 168, 174 (1st Cir. 2021) (quotation marks omitted); *see Suski*, 602 U.S. at 145 ("[D]isputes are subject to arbitration if, and only if, the parties actually agreed to arbitrate those disputes.").

### I.   Contract Formation.

As the party seeking to compel arbitration, the defendants bear the burden to first prove that a valid agreement to arbitrate exists. *See Cullinane v. Uber Techs., Inc.*, 893 F.3d 53, 60-61 (1st Cir. 2018).[2] State contract law supplies the principles for determining whether an enforceable

---

[2] Motions to compel arbitration are governed by the summary judgment standard. *Air-Con*, 21 F.4th at 174-75. Under that standard, "the court must construe the record in the light most favorable to the non-moving party and draw all reasonable inferences in its favor." *Id.* at 175. "If the non-

arbitration agreement exists. *See Air-Con*, 21 F.4th at 174. The parties dispute whether New York or Massachusetts law applies, with the defendants advocating the former and Schwartz the latter. The Court "need not resolve the [choice-of-law] issue, however, as the outcome is the same under the substantive law of either jurisdiction." *Lambert v. Kysar*, 983 F.2d 1110, 1114 (1st Cir. 1993) (citing *Cohen v. McDonnell Douglas Corp.*, 389 Mass. 327, 332 (1983)); *accord Morales-Posada v. Cultural Care, Inc.*, 141 F.4th 301, 307 (1st Cir. 2025). As the defendants concede, "the basic principles of contract interpretation" are "the same" under the laws of Massachusetts and New York. *Tutor Perini Corp. v. Banc of Am. Sec. LLC*, No. 11-cv-10895-NMG, 2012 WL 2178950, at *8 n.9 (D. Mass. June 13, 2012); *see* ECF 17, at 5, 13. The Court will, accordingly, rely on Massachusetts law.[3]

Under Massachusetts contract law, to compel arbitration pursuant to an arbitration agreement, the defendants "must demonstrate both offer and acceptance." *Good v. Uber Techs., Inc.*, 494 Mass. 116, 126 (2024). To show that an allegedly nonnegotiable and standardized contract "was formed, 'there must be both . . . notice of the terms of the contractual offer and a reasonable manifestation of assent to those terms so as to constitute acceptance of the offer.'" *Id.* (quoting *Kauders v. Uber Techs., Inc.*, 486 Mass. 557, 572 (2021) (brackets omitted)).

---

moving party puts forward materials that create a genuine issue of fact about a dispute's arbitrability, the district court 'shall proceed summarily' to trial to resolve that question." *Id.* (quoting 9 U.S.C. § 4).

[3] While the Terms and Conditions contain a New York choice-of-law provision, this clause is not dispositive. *See* ECF 17-2, § 25; *Crean v. Morgan Stanley Smith Barney, LLC*, 652 F. Supp. 3d 171, 179 (D. Mass. 2023) (collecting cases in this Court finding that "contractual choice-of-law clauses do not apply to a validity determination").

A.     Reasonable Notice.

Since the parties agree that Schwartz lacked actual notice of Factor75's arbitration agreement,[4] the defendants must demonstrate reasonable notice of the agreement's terms. *Id.* at 127. Such reasonable notice may exist "'so long as [Schwartz] had an adequate opportunity'" to review those terms. *Id.* (quoting *Archer v. Grubhub, Inc.*, 490 Mass. 352, 361 (2022)). A court must analyze the "totality of the circumstances" to determine whether reasonable notice of the terms of the offer was provided. *Id.* at 127-28 (quotation marks omitted); *Kauders*, 486 Mass. at 573. That test involves consideration of (1) "the nature, including the size, of the transaction," (2) "the interface by which the terms are being communicated," (3) "the form of the contract," and (4) "whether the notice conveys the full scope of the terms and conditions." *Good*, 494 Mass. at 128 (quotation marks omitted); *Kauders*, 486 Mass. at 573. Reasonable notice does not exist unless Factor75 notified Schwartz that there *are* binding terms, including a mandatory arbitration clause, and Schwartz had an opportunity to review those terms. *See Good*, 494 Mass. at 128; *Kauders*, 486 Mass. at 573.

The defendants have shown that Schwartz had reasonable notice of Factor75's terms based on the factors identified in *Good* and *Kauders*. First, in analyzing the nature and size of the transaction, the Court considers "the perspective of reasonable people in the position of the parties." *Good*, 494 Mass. at 128-29 (quotation marks omitted). A reasonable consumer "may not have expected to be entering a contract at all" when, for example, using a ride-sharing app to request a ride, *id.* at 129, or purchasing a credit score, *see Kauders*, 486 Mass. at 575 (citing *Sgouros v. TransUnion Corp.*, 817 F.3d 1029, 1035 (7th Cir. 2016)). Here, in contrast, a reasonable

---

[4] Actual notice exists where the offeree has actually reviewed the terms or where the offeree was required to "'interact with the terms before agreeing to them,' including by scrolling through them." *Good*, 494 Mass. at 127 (quoting *Kauders*, 486 Mass. at 572).

7

consumer purchasing a subscription and meal plan would be more likely than consumers in those circumstances to understand that such a subscription may require acceptance of contractual terms. *See* ECF 17-1, ¶¶ 2-3.

Second, the Court examines the form of the contract and "whether the interface presented the terms in a manner that to a reasonable person in the user's circumstance would 'appear to be [a] contract.'" *Id.* at 128, 130 (quoting *Kauders*, 486 Mass. at 573). Schwartz contends that the notice of Factor75's Terms and Conditions was not conspicuous because the sole reference to those terms appeared at the bottom of the webform in a smaller font that was not bolded. But the interface included discrete white boxes for "Email Preferences" and "Promotions, offers & marketing," and the Terms and Conditions appeared in the latter box. ECF 17-1, ¶ 3 (bold omitted). The words Terms and Conditions sat immediately below the toggle switch that Schwartz clicked to indicate his agreement to "[r]eceive offers and promotions via text messages" from Factor75. *Id.* The presence of the Email Preferences section at the top of the webform would not have distracted a user from noticing the hyperlinked Terms right below the toggle switch. *See Good*, 494 Mass. at 131 ("The link to the terms of use was not buried on a cluttered screen or presented inconspicuously at the tail end of a cumbersome registration and payment process."). The Terms and Conditions were underlined, written in blue text, and thus appeared as a hyperlink. ECF 17-1, ¶¶ 3-4; *see Good*, 494 Mass. at 133 ("'hyperlinks . . . are commonly blue and underlined'" (quoting *Cullinane*, 893 F.3d at 63)). The webform also reasonably appeared to be a contract, as it made clear that "[b]y checking the box above, [Schwartz] agree[d] to Factor's Terms and Conditions." ECF 17-1, ¶ 3. Despite the smaller font, the notice was legible and distinguishable as the only part of the webform to contain blue text and consist of full sentences. *See Cullinane*, 893 F.3d at 62 (identifying "contrasting font" as a "general characteristi[c] that make[s] a term conspicuous").

By clicking the hyperlink, Schwartz would have been brought to Factor75's Terms and Conditions. ECF 17-1, ¶ 4. The first two pages of those terms reminded users to "REVIEW THE TERMS CAREFULLY, PARTICULARLY . . . SECTION 24 RELATED TO BINDING ARBITRATION," and to "BE AWARE THAT SECTION 24 . . . CONTAINS AN ARBITRATION AGREEMENT WHICH WILL, WITH LIMITED EXCEPTIONS, REQUIRE DISPUTES BETWEEN US TO BE SUBMITTED TO BINDING AND FINAL ARBITRATION." ECF 17-2, at 1-2 (bold omitted); *see* ECF 17-1, ¶ 4. Based on "the language used to notify the user of the terms, the prominence with which the hyperlink . . . to the terms was displayed, and the clarity and extensiveness of the process to access the terms," the webform "'would have provided a reasonably prudent user notice of the terms being offered, including the arbitration provision.'" *Good*, 494 Mass. at 130 (quoting *Archer*, 490 Mass. at 362 (brackets omitted)). The interface therefore reasonably communicated that Factor75 was presenting its terms.

Finally, the Court considers whether the webform conveyed the full scope of the terms. As discussed, Factor75's interface provided a hyperlink to its Terms and Conditions, which included an arbitration provision. Considering the totality of the circumstances, Factor75 conveyed reasonable notice to Schwartz because the webform "made those terms readily available," gave him the chance to review them, and notified him that he would be bound by them. *Id.* at 139.

B.  Reasonable Manifestation of Assent.

The defendants must further demonstrate that Schwartz reasonably assented to the Terms and Conditions. To determine whether Schwartz assented to those terms, the Court "'consider[s] the specific actions required to manifest assent.'" *Id.* at 142 (quoting *Kauders*, 486 Mass. at 573-

74). "'The connection between the action that manifests assent and the terms should be direct and unambiguous.'" *Id.* (quoting *Kauders*, 486 Mass. at 580 (brackets omitted)).

It is undisputed that Schwartz clicked the toggle switch and that the words immediately below it stated: "By checking the box above, I agree to Factor's Terms and Conditions," which were hyperlinked. ECF 17-1, ¶¶ 3-4. Massachusetts courts "'regularly enforc[e]'" such "'clickwrap'" contracts where, as here, "a user is 'required to expressly and affirmatively manifest assent to an online agreement by clicking or checking a box that states that the user agrees to the terms and conditions.'" *Good*, 494 Mass. at 143 (quoting *Kauders*, 486 Mass. at 574). Schwartz disputes that this is "a true clickwrap agreement" because the "I agree" language appeared below the toggle switch instead of next to it. ECF 26, at 8 & n.13. In his view, a user could click that box believing that he had consented only to "[r]eceive offers and promotions via text messages," not to form a contract. ECF 17-1, ¶ 3. As explained, however, Factor75's webform depicted "Promotions, offers & marketing" in a discrete section, contained within a white box, and the language about assent appeared within that section in close proximity to the box that Schwartz checked. *Id.* (bold omitted).

In *Nicosia v. Amazon.com, Inc.*, which the Supreme Judicial Court has cited favorably, the Second Circuit endorsed a district court decision enforcing a forum selection clause where the "user was 'informed of the consequences of his assenting click' because he was shown, immediately below the 'Sign Up' button, a notice stating, 'By clicking Sign Up, you are indicating that you have read and agree to the Terms and Service.'" 834 F.3d 220, 237 (2d Cir. 2016) (quoting *Fteja v. Facebook, Inc.*, 841 F. Supp. 2d 829, 835, 840 (S.D.N.Y. 2012)); *see Kauders*, 486 Mass. at 580 (citing *Nicosia*). The same reasoning applies here. Because the connection between the

manipulation of the toggle switch and the words indicating assent was direct and unambiguous, Schwartz entered into an arbitration agreement with Factor75. *See Good*, 494 Mass. at 142-43.

## II.     **Arbitrability.**

The defendants must also demonstrate that Schwartz "agreed to arbitrate issues of arbitrability, including the validity and scope of the arbitration agreement." *Toth v. Everly Well, Inc.*, 118 F.4th 403, 414 (1st Cir. 2024). The first page of the hyperlinked Terms and Conditions stated, in pertinent part, "PLEASE REVIEW THE TERMS CAREFULLY, PARTICULARLY . . . SECTION 24 RELATED TO BINDING ARBITRATION." ECF 17-2, at 1 (bold omitted); *see* ECF 17-1, ¶¶ 3-4. In Section 24, with limited exceptions not applicable here, Schwartz "agree[d] that any dispute, claim, or request for relief relating in any way to [his] access or use of the Site or the App, to any products sold or distributed through the Site or the App, or to any aspect of [his] relationship with Factor, will be resolved by binding arbitration, rather than in court." ECF 17-2, § 24.1. Section 24 also provided that "[t]he arbitrator shall have exclusive authority to (a) determine the scope and enforceability of this Arbitration Agreement and (b) resolve any dispute related to the interpretation, applicability, enforceability, or formation of this Arbitration Agreement including . . . any assertion that all or any part of this Arbitration Agreement is void or voidable." *Id.* § 24.3. This Section thus "contain[ed] an express delegation clause" that constitutes "clear and unmistakable delegation of arbitrability issues" to an arbitrator. *Bossé v. New York Life Ins. Co.*, 992 F.3d 20, 28 (1st Cir. 2021).

Section 24 further stated that "[t]he arbitration will be conducted by JAMS," and that "[d]isputes involving claims, counterclaims, or request for relief under $250,000, not inclusive of attorneys' fees and interest, shall be subject to JAMS's most current version of the Streamlined Arbitration Rules and procedures" while "all other disputes shall be subject to JAMS's most

current version of the Comprehensive Arbitration Rules and Procedures." ECF 17-2, § 24.2. Both sets of JAMS's rules provide that "[j]urisdictional and arbitrability disputes, including disputes over the formation, existence, validity, interpretation or scope of the agreement under which Arbitration is sought, and who are proper Parties to the Arbitration, shall be submitted to and ruled on by the Arbitrator." Comprehensive Arbitration Rule 11(b), https://www.jamsadr.com/rules-comprehensive-arbitration; Streamlined Arbitration Rule 8(b), https://www.jamsadr.com/rules-streamlined-arbitration. Like the delegation clause itself, this language reflects the "clear and unmistakable intent" of Factor75 and Schwartz "to delegate arbitrability issues to the arbitrator." *Bossé*, 992 F.3d at 29; *see Beck v. Vision Serv. Plan Ins. Co.*, 600 F. Supp. 3d 145, 151-52 (D. Mass. 2021) (invoking Streamlined Arbitration Rule 8(b) in compelling arbitration); *accord Tannatt v. Varonis Sys., Inc.*, No. 18-cv-12589-JGD, 2019 WL 830482, at *5 (D. Mass. Feb. 21, 2019) ("By incorporating the JAMS [Employment Arbitration] Rules into the arbitration provision, the parties agreed to be bound by rules that clearly and unmistakably provide for the arbitrator to determine arbitrability.").

Schwartz argues that his claims are outside the scope of the arbitration provision and cannot be subject to arbitration based on the survival clause which, he contends, is ambiguous. *See* ECF 17-2, § 24.8. But the Court need not address the parties' dispute about the ambiguity of the survival clause because, in light of the agreement's delegation clause, Schwartz may "only challenge the formation of the contract or the specific validity of the delegation provision." *Toth*, 118 F.4th at 410. As explained, an agreement to arbitrate exists between Schwartz and Factor75. Because Schwartz's additional arguments do not question the validity of the delegation clause itself, his arguments about the survival clause are for the arbitrator, not this Court, to decide. The defendants have, accordingly, demonstrated that Schwartz agreed to arbitrate issues of arbitrability.

**III.     Equitable Estoppel.**

While a valid arbitration agreement exists between Factor75 and Schwartz, the parties also dispute whether HelloFresh, as an admitted nonsignatory, can enforce that agreement under the doctrine of equitable estoppel. The Court applies Massachusetts law to this issue as well. *See Morales-Posada*, 141 F.4th at 307-08 (bypassing the choice-of-law question where the party seeking to compel arbitration agrees that there is no relevant difference in the substantive bodies of law advanced by the parties).[5]

The Supreme Judicial Court "has acknowledged six theories under which a nonsignatory may enforce a contract, such as an arbitration agreement, against a signatory." *Landry v. Transworld Sys. Inc.*, 485 Mass. 334, 339 (2020). Under the sole theory invoked by the defendants, an equitable estoppel theory, a nonsignatory may compel arbitration "when a signatory must rely on the terms of the written agreement in asserting its claims against the nonsignatory." *Machado v. System4 LLC*, 471 Mass. 204, 211 (2015) (quotation marks omitted). This theory does not apply in the circumstances of this case. Schwartz's claims against the defendants arise under the TCPA, MTSA, and Chapter 93A. These claims are based on statutory causes of action, not the rights or responsibilities set forth in the written agreement between Schwartz and Factor75. The claims therefore cannot "be considered to arise out of and be directly intertwined with that agreement." *Id.* Nor can HelloFresh rely on Section 4.4 of the Terms and Conditions, which involves consent

---

[5] The defendants maintain that, in light of the broad delegation clause in the Terms and Conditions, the question whether Schwartz must arbitrate his claims against HelloFresh is a question for the arbitrator. That premise is mistaken. It is a threshold question whether HelloFresh, as a nonsignatory to the contract, can rely on equitable estoppel to compel Schwartz to arbitrate. *See Morales-Posada*, 141 F.4th at 309. HelloFresh cannot invoke a provision of the contract to compel arbitration before it is determined whether it may enforce the contract against Schwartz at all. The applicability of HelloFresh's equitable estoppel theory is therefore a question for the Court, not the arbitrator. *Id.*

to communication and which HelloFresh wishes to invoke as a defense to Schwartz's claims, to demonstrate that Schwartz's claims are directly intertwined with the terms of the contract. *See* ECF 17-2, § 4.4. That is so because the applicability of equitable estoppel turns on whether "a party's *claims* are so intimately founded in and closely related to an agreement which also mandates arbitration." *Id.* (emphasis added). As the First Circuit explained in *Breda v. Cellco Partnership*, TCPA and related claims do not "involve a contractual right," but instead arise from separate and distinct statutes enacted in response to "the nuisance and invasion of privacy caused by automated or prerecorded telephone calls." 934 F.3d 1, 4, 8 (1st Cir. 2019) (citing *Gamble v. New Eng. Auto Fin., Inc.*, 735 Fed. App'x 664, 666 (11th Cir. 2018), for the proposition that TCPA claims "'aris[e] not from [a contract] or any breach of it, but from the post-agreement conduct that allegedly violates a separate, distinct federal law'"); *see also id.* at 4 n.4 (explaining that consent is an affirmative defense to a TCPA claim, and that "lack of consent is not an element of the called party's claim").

The defendants' reliance on *Sourcing Unlimited, Inc. v. Asimco International, Inc.*, 526 F.3d 38 (1st Cir. 2008), is misplaced. In that case, the First Circuit compelled a plaintiff to arbitrate its claims against a nonsignatory defendant based on an equitable estoppel theory because those claims were "sufficiently intertwined" with the agreement that the plaintiff had signed with the defendant's parent company. *Id.* at 43, 47. Here, by contrast, Schwartz's claims do not "directly or indirectly invoke the terms of the" agreement between him and Factor75. *Id.* at 47. They instead arise under the TCPA, MTSA, and Chapter 93A and would exist regardless of that agreement. *See Hogan v. SPAR Grp., Inc.*, 914 F.3d 34, 42 (1st Cir. 2019) (distinguishing *Sourcing Unlimited* and finding "no cognizable basis for applying equitable estoppel" where plaintiff's claims were "premised upon Massachusetts wage and hour law, not the . . . Agreement"); *accord Morales-*

*Posada*, 141 F.4th at 319-20. Since Schwartz's statutory claims against HelloFresh do not "arise out of [or] relate directly to terms" in the agreement between him and Factor75, equitable estoppel does not apply. *Machado*, 471 Mass. at 212-13; *see Rahmany v. T-Mobile USA Inc.*, 717 F. App'x 752, 753 (9th Cir. 2018) (reversing order allowing nonsignatory to equitably estop plaintiff from avoiding an arbitration agreement because the TCPA, not that agreement, "create[d] and define[d] any alleged duty to refrain from sending an unwanted text message"); *Drayton v. Toyota Motor Credit Corp.*, 686 F. App'x 757, 759 (11th Cir. 2017) (affirming denial of motion to compel arbitration because "equitable estoppel [was] not appropriate" where plaintiff asserted a TCPA claim and was thus "not seeking to hold [nonsignatory] to the terms of" her arbitration agreement). Accordingly, only Factor75, not HelloFresh, may invoke the arbitration agreement.

## IV.  Stay.

The defendants have requested that this action be stayed pending arbitration. When, as here, "a district court finds that a lawsuit involves an arbitrable dispute, and a party requests a stay pending arbitration, § 3 of the FAA compels the court to stay the proceeding." *Smith v. Spizzirri*, 601 U.S. 472, 478 (2024); *see* 9 U.S.C. § 3. Schwartz agrees that a stay would be appropriate if the Court were to grant the motion to compel arbitration. This case will, accordingly, be stayed pending arbitration between Schwartz and Factor75. And given that Schwartz asserts the same claims against Factor75 and HelloFresh, the Court will also exercise its inherent authority "to stay litigation among the non-arbitrating parties pending the outcome of the arbitration." *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20 n.23 (1983); *accord McCarthy v. Azure*, 22 F.3d 351, 361 n.15 (1st Cir. 1994).[6]

---

[6] Since the defendants' motion to dismiss is argued in the alternative, the Court need not address their arguments for dismissal at this juncture, and the motion to dismiss will be denied without prejudice to renewal following the conclusion of the arbitration.

15

## CONCLUSIONS AND ORDERS

For the foregoing reasons, the defendants' motion to compel arbitration or alternatively to dismiss, ECF 16, is GRANTED in part and DENIED in part without prejudice. This case is hereby STAYED pending arbitration between Schwartz and Factor75. The parties are ORDERED to file a joint status report with the Court within 14 days of the conclusion of the arbitration between Schwartz and Factor75.

SO ORDERED.

Dated: January 21, 2026

/s/ Julia E. Kobick
JULIA E. KOBICK
UNITED STATES DISTRICT JUDGE